IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

JOHNNY R. ROGERS, SR.,                                        PLAINTIFF

vs.                              Civil No. 2:19-cv-02077-PKH-MEF

ANDREW M. SAUL, Commissioner,                                 DEFENDANT
Social Security Administration

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Johnny R. Rogers, Sr., brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. 42 U.S.C. § 405(g).

## I.      Procedural Background

Plaintiff protectively filed his current application for DIB on June 27, 2017. (ECF No. 13, p. 15). Plaintiff alleges disability since November 1, 2016, due to impairment of his upper left and right extremities, arthritis, trigger finger, lumbar spine pain with disc bulging and bone spurs, and heart disease. (*Id.*, pp. 15, 235).

Plaintiff's application was denied initially and upon reconsideration. (*Id.*, pp. 15, 124, 131). An administrative hearing was held on November 1, 2018, before the Hon. Bill Jones, Administrative Law Judge ("ALJ"). (*Id.*, pp. 15, 80-97). Plaintiff and a vocational expert ("VE"), Kola Brown, testified. (*Id.*). Plaintiff was represented by counsel, David Harp. (*Id.*).

By written decision dated January 2, 2019, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease, carpal tunnel syndrome, coronary artery disease, and

disorder of the left shoulder.  (*Id.*, pp. 12, 17).  The ALJ next determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any impairment in the Listing of Impairments.  (*Id.*).  The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except occasionally stoop, crouch, and reach overhead with his left upper extremity.  (*Id.*, pp. 18-21).

With the assistance of the VE, the ALJ found that Plaintiff was able to perform his past relevant work as a distribution warehouse manager.  (*Id.*, p. 22).  The ALJ concluded that Plaintiff had not been under a disability as defined by the Act during the relevant period.  (*Id.*).

On May 31, 2019, the Appeals Council denied Plaintiff's request for review.  (*Id.*, pp. 5-10).  Plaintiff filed this action on June 19, 2020.  (ECF No. 2).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 16, 17), and the case is ready for decision.

## II.    Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case.  The complete sets of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

At the administrative hearing, Plaintiff testified that he worked as a senior manager for a gas production company and was able to do this job with the help of an assistant who would pull files and do his typing.  (ECF No. 13, p. 83).  He lost that job due to layoffs, and he was unable to go to work for the company that bought his company out because he could not have done his work without an assistant.  (*Id.*, pp. 84-85, 235).  Plaintiff testified that his arms and hands would draw up if he had to do a lot of writing and his arms ached, especially the left arm.  (*Id.*, pp. 86-87).

Plaintiff testified he had daily back pain which went down into his left hip and which hurt badly if he walked very far. (*Id.*, p. 90-91). He testified that he was unable to reach up to a drive-thru with his left arm and would have to reach over with his right arm. (*Id.*, p. 91). He also testified he had reduced grip strength and could not handle any vibration. (*Id.*).

Plaintiff saw Robert Wilson, M.D., on April 19, 2016 with muscle cramps in his legs and right arm. (*Id.*, p. 296). Plaintiff reported he had recently moved and had been hanging blinds and had also recently fallen while getting out of his boat. (*Id.*). Dr. Wilson ordered lab tests to evaluate Plaintiff's magnesium levels and thyroid stimulating hormones, and he prescribed Lexapro. (*Id.*, p. 297). Dr. Wilson also recommended tonic water or Cramp-EZE for the muscle cramps. (*Id.*)

Plaintiff saw Dr. Wilson, M.D., again on October 3, 2016, with back pain and leg cramps. (*Id.*, p. 364). Dr. Wilson recommended weight loss and back exercises. (*Id.*, p. 365). On October 25, 2016, Plaintiff reported to Brian Goodman, M.D., that his back pain was coming back, but he was not using his prescribed Robaxin or diclofenac as prescribed. (*Id.*, p. 334-35). Plaintiff reported that he fell off a cabinet. (*Id.*). Dr. Goodman assessed Plaintiff with lumbar radiculopathy on the right at L4-5 and S1 levels and lumbar spondylosis. (*Id.*, p. 336). Dr. Goodman recommended Plaintiff use his medications as prescribed, consider physical therapy, and if needed call back to get lumbar epidural spinal injections. (*Id.*).

Plaintiff went to the emergency room on January 10, 2017, with complaints of chest pain that increased with activity. (*Id.*, p. 358). He was prescribed Lisinopril, discharged, and encouraged to follow up with his cardiologist. (*Id.*, p. 361). He followed up with his cardiologist, Andre Nolewajka. M.D., and reported being active and in the process of building a new home but experiencing left sided chest pressure with pain in both arms. (*Id.*, p. 348). Dr. Nolewajka ordered a cardiac catherization which showed obstruction, so a stent was placed. (*Id.*, pp. 350, 352, 396,

484-88).  On February 3, 3017, Plaintiff saw Dr. Wilson for a follow-up after his stent placement and reported his symptoms had resolved.  (*Id*., p. 299).  He was advised to wear night splints for his carpal tunnel, and to lose weight.  (*Id*., p. 300).  On March 1, 2017, Plaintiff saw Alesia Davis, APRN, at Mercy Cardiology for follow-up and reported feeling great, and he had been able to return to finishing the house he and his wife were building two days after having the stent placed. (*Id*., p. 343).

On March 12, 2017, Plaintiff saw Dr. Wilson and still had low back pain and leg cramps. (*Id*., pp 301).  Dr. Wilson again recommended weight loss and back exercises.  (*Id*., p. 302).

On June 7, 2017, Plaintiff told Dr. Wilson that he continued to have joint pain, particularly in his hips and hands, and he was losing grip strength in his hands.  (*Id*., p. 302).  He had positive Phalen's and Tinel's signs.  (*Id*., p. 303).  Dr. Wilson prescribed night splints, glucosamine, and naproxen for carpal tunnel syndrome and joint pain and ordered a nerve conduction study.  (*Id*., p. 304).  The nerve conduction study showed bilateral sensory neuropathy, left median motor neuropathy, and left ulnar sensorimotor mononeuropathy at the elbow.  (*Id*., pp. 386-87).

On August 16, 2017, Plaintiff saw Dr. Wilson for left shoulder pain described as constant for the past six months, worsened by daily range of motion movements, and which disrupted his sleep.  (*Id*., p. 305).  Dr. Wilson gave Plaintiff shoulder exercises, a cholesterol reduction diet, and a referral to Dr. Bylak.  (*Id*., p. 305).  An X-ray was taken of plaintiff's left shoulder, which showed mild left acromioclavicular spurring.  (*Id*., p. 321).

Dr. Wilson provided a medical source statement on August 16, 2017.  (*Id*., pp. 449-51). Dr. Wilson opined Plaintiff could lift and carry less than 10 pounds, stand or walk less than two hours per day, and sit for less than six hours per day.  (*Id*.).  Dr. Wilson checked boxes indicating Plaintiff would be limited in pushing and pulling in both upper and lower extremities.  (*Id*.).  In

support of the above opinions, Dr. Wilson noted Plaintiff had symptoms of bilateral carpal tunnel release and tendonitis of the left shoulder with pain, numbness, tingling, decreased sensation and poor grip strength in the upper extremities. (*Id*.). Dr. Wilson opined Plaintiff could occasionally balance, but could never climb, kneel, crouch, or crawl. (*Id*.). Dr. Wilson opined Plaintiff had limited ability to reach, handle, finger, and feel, and he would be unable to lift more than 10 pounds or lift above his head. (*Id*.). Dr. Wilson further opined Plaintiff had limited hearing and limited ability to work around temperature extremes, vibrations, or hazards. (*Id*.). These environmental limitations were noted to be due to poor high and low frequency hearing, coronary atherosclerosis, and joint pain and stiffness due to arthritis, noting Plaintiff's upper extremities felt as though they were asleep most of the time. (*Id*.).

On August 28, 2017, Plaintiff was seen by neurologist William Knubley, M.D., for bilateral upper extremity pain and numbness. (*Id*., p. 460). Plaintiff reported waking up during the night with his hands asleep, having cramping and numbness when he was writing, as well as swelling in his hands and popping in some of his fingers. (*Id*., pp. 460-61). Wrist splints helped, but after using his hands quite a bit it would take days for the numbness and tingling to resolve. (*Id*.). Plaintiff reported an injury six to seven months prior when he fell off a counter to the floor and needed some epidural steroid injections, but otherwise no recent injury. (*Id*.). A physical examination showed strikingly positive Tinel's signs in both wrists, more so on the right. (*Id*., p. 463). Plaintiff had mild reduction to sensation and vibration in both feet, and variable degrees of sensory loss in the left hand, but more consistent sensory changes in the median nerve distribution in the right hand. (*Id*) Dr. Knubley had several diagnostic considerations, including a suspicion that Plaintiff had recurrent carpal tunnel syndrome in both hands despite absence of changes on the EMG. (*Id*., p. 465). Dr. Knubley also opined Plaintiff may have peripheral neuropathy, but

the hyporeflexia in the lower extremities may also be related to lumbar spine disease instead of neuropathy. (*Id.*). Dr. Knubley recommended peripheral neuropathy evaluation with laboratory studies, and that Plaintiff continue wearing wrist splints in the meantime. (*Id.*). If his workups were negative, Dr. Knubley planned to strongly consider evaluation by orthopedics for recurrent carpal tunnel surgery. (*Id*)

On August 29, 2017, Plaintiff was seen by Joseph Bylak, M.D., at Mercy Clinic Orthopedic for left shoulder pain. (*Id.*, p. 459). His shoulder strength was noted to be somewhat weak to flexion and external rotation. (*Id.*). Dr. Bylak gave Plaintiff an injection in his left shoulder, a home exercise program, and he ordered an MRI of the shoulder to evaluate rotator cuff integrity. (*Id.*, p. 460). He also referred Plaintiff to Dr. Kelly for evaluation and treatment of cubital tunnel, as well as his left carpal tunnel, and possibly work on the right as well. (*Id.*). Plaintiff had an MRI of his left shoulder on September 14, 2017, and he saw Dr. Bylak again on September 21, 2017. (*Id.*, pp. 595-97). Dr. Bylak informed Plaintiff he did not have an obvious rotator cuff tear, but tendinous changes, significant arthropathy of the acromioclavicular joint, and significant degenerative changes around the humeral head and labral complex. (*Id.*). Plaintiff reported fair improvement from the first injection and wanted to wait on having surgery on his left shoulder until he saw Dr. Kelly about his carpal tunnel symptoms. (*Id*).

Plaintiff saw James Kelly, M.D. on October 4, 2017. He reported having increasing numbness in his hands, which was causing him to drop things, and he was having difficulty with functional use of his arms. (*Id.*, p. 615). Dr. Kelly noted strongly positive Tinel's and compression tests in both elbows and positive Tinel's, Phalen's, and compression tests in both wrists. (*Id.*). Dr. Kelly recommended left cubital and carpal tunnel release first, as that side was the most bothersome. (*Id.*).

On October 24, 2017, Plaintiff returned to APRN Davis for cardiac follow-up and reported being unable to work as hard or as long. (*Id*. p. 725). APRN Davis stressed the importance of treating his obstructive sleep apnea, as he had not been wearing his CPAP, as well as the need for some form of cardio exercise like walking. (*Id*., p. 727).

Dr. Kelly performed endoscopic left carpal tunnel release, left cubital tunnel release, and lengthening of the tendon at the left elbow on November 2, 2017. (*Id*., p. 617). Plaintiff had a follow-up visit on November 29, 2017, and reported his arm felt very good and the pain and numbness were gone. (*Id*., p. 619). On December 27, 2017, Dr. Kelly performed right endoscopic carpal tunnel release; right cubital tunnel release; lengthening of the tendon at the right elbow; right D1, Al pulley release; right D2 flexor digitorum superficialis, and flexor digitorum profundus synovectomy; and, fasciotomy of the wrist and distal forearm. (*Id*., pp. 620, 622-23). On January 29, 2018, Plaintiff had a follow-up visit and reported his sensation was much better in his first three fingers, and that the intermittent numbness in his fourth and fifth fingers seemed to be improving. (*Id*., p. 624). Dr. Kelly advised Plaintiff that this would continue to improve over time, as would his grip strength. (*Id*.). Dr. Kelly opined Plaintiff no longer had any restrictions on the right, and informed Plaintiff he would see him on an as needed basis going forward. (*Id*.).

On March 2, 2018, Plaintiff saw Dr. Knubley and reported less pain waking him during the night, but continued difficulty using his hands due to numbness and tingling. (*Id*., p. 626). Dr. Knubley told him it was still relatively early, and it may take longer to reach recovery, but with his history of previous surgery he may have more nerve injury and may not completely recover. (*Id*.). His diagnoses were recurrent bilateral carpal tunnel syndrome status post-surgery; recurrent bilateral cubital tunnel syndrome status post-surgery; degenerative arthritis of the hands; possible neuropathy based on exam; hyporeflexia in the lower extremities; sleep apnea; and, left shoulder

pain. (*Id.*, p. 628). Dr. Knubley added Voltaren gel, Metanx and Gabapentin to Plaintiff's medications. (*Id.*).

On May 8, 2018, Plaintiff saw Dr. Bylak and still wanted to defer left shoulder surgery. (*Id.*, p. 629). As he reported good results with shoulder injections, Dr. Bylak administered another injection to keep Plaintiff's shoulder within a comfort level that would allow him to work on his exercise program of strength and range of motion. (*Id*).

On May 23, 2018, Plaintiff had another visit with APRN Davis and report no longer having chest pain or palpitations. (*Id.*, p. 729). His coronary artery disease was listed as stable, and he was again urged to use his CPAP for sleep apnea (and was given some printed information about sleep apnea). (*Id.*, p. 731). APRN Davis noted Plaintiff was active but needed to do some form of cardio exercise. (*Id*). On August 23, 2018, Plaintiff saw Dr. Wilson and reported he was on a different joint pain medication which helped, but his hands and arms still bothered him. (*Id.*, p. 60). He also reported he had recently felt chest pain and shortness of breath, but when he called and spoke to his cardiologist, they told him that he needed to be wearing his CPAP at night. (*Id.*). Dr. Wilson prescribed Cymbalta. (*Id.*).

On August 29, 2018, Plaintiff saw Heather Manchester, APRN, at the pain clinic for ongoing back pain, stiffness and pain into his right hip, and intermittent numbness and tingling in his right foot. (*Id.* p. 747). Plaintiff reported having injections from Dr. Goodman in the past that had been very effective. (*Id.*). He had an antalgic gait, positive straight leg raises bilaterally, and positive Faber test bilaterally. (*Id.*, p. 748). Strength and tone in all extremities were grossly normal. (*Id.*). L1-S1 sensation to light touch was normal, except L4 and S1 on the right. (*Id.*). Plaintiff was diagnosed with lumbar radiculopathy on the right at L4 and S1 and lumbar spondylosis. (*Id*). APRN Manchester ordered a series of four lumbar epidural steroid injections

with Dr. Goodman.  (*Id*., p. 749).  Dr. Goodman administered injections on September 20 and October 22, 2018.  (*Id*., p. 751, 755, 759, 763).  On November 8, 2018, Plaintiff returned to APRN Manchester and reported the symptoms in his right lower extremity were significantly improved, but he continued to have low back pain which was focal to the left lower back.  (*Id*., p. 767).  He reported 40% pain improvement, with pain of 7/10 that day, and his pain continued to interfere with his activities.  (*Id*.).  His straight leg raise test and Faber test were negative bilaterally, and L1-S1 sensation was normal without exception.  (*Id*., p. 768).  Plaintiff's lumbar radiculopathy was listed as resolved, and mechanical back pain was added to his diagnoses.  (*Id*., p. 769).  APRN Manchester recommended facet steroid injections at L3, L4, and L5, and to repeat lumbar epidural steroid injections if his right lower extremity pain returned.  (*Id*.).

On November 28, 2018, Plaintiff told Dr. Wilson that he did not like the way Cymbalta made him feel.  (*Id*., p. 63).  It gave him night sweats, crazy dreams, and made his fingers draw up together.  (*Id*.).  Dr. Wilson discontinued Cymbalta and prescribed Effexor instead, ordered a brain MRI, and referred Plaintiff to Dr. Keating for evaluation of a possible neuralgia.  (*Id*.).

Plaintiff had a lumbar facet injection administered by Dr. Goodman on December 5, 2018.  (*Id*., p. 77).  On January 3, 2019, the day after the ALJ issued his decision, Plaintiff saw APRN Manchester and reported improved back pain and that his pain was at a 4/10.  (*Id*., p. 54).  He had a positive left straight leg raise and diminished sensation to touch at L4, L5, and S1.  (*Id*., p. 56).  He felt the injections had been helpful and that the remaining discomfort was tolerable, though it continued to interfere with his activity.  (*Id*.).  APRN Manchester noted Plaintiff would like to hold off on injections for now.  (*Id*.).  APRN Manchester told Plaintiff to contact the office if he would like to proceed with further facet steroid injections.  (*Id*.).

### III.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least 12 consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial

gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  20 C.F.R. § 404.1520(a)(4).  Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 404.1520(a)(4)(v).

## IV.    Discussion

Plaintiff raises the following issues in this appeal: (1) whether the ALJ erred in his assessment of Plaintiff's subjective complaints; (2) whether the ALJ erred in his RFC determination; and, (3) whether the ALJ erred in his step four finding.  (ECF No. 16, pp. 12-21).

### A.    Subjective Complaints

Plaintiff first argues the ALJ did not sufficiently address Plaintiff's subjective complaints and inappropriately relied on isolated statements of improvement without acknowledging the longitudinal arc of his impairments.  (ECF No. 16, pp. 17-18).

The ALJ is required to consider all the evidence relating to Plaintiff's subjective complaints, including evidence presented by third parties, that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and, (5) functional restrictions.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support

them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id.* As the Eighth Circuit has observed, "[o]ur touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

The ALJ considered Plaintiff's reported activities of daily living. (ECF No. 13, p. 20). The ALJ considered Plaintiff's reported ability to manage personal care and grooming tasks independently, sweep the floor, change the laundry, do some mowing on a riding mower, drive, go out alone, shop in stores, and manage personal finances. (*Id.*). The ALJ considered treatment notes from April 19, 2016, showing Plaintiff reported he had been hanging blinds and fell getting out of his boat. (*Id.*). The ALJ also considered records from March 1, 2017 where he reported he was able to go back to finishing the house he and his wife were building two days after getting a stent in his heart and had no further symptoms. (*Id.*). The ALJ also considered Plaintiff's adverse side effects from medication, noting Plaintiff either did not report adverse side effects, or had his medications adjusted. (*Id.*). The ALJ also noted the record contained some evidence of non-compliance with medication. (*Id.*).

Further, the ALJ considered Plaintiff's reports of symptoms in the medical records. Plaintiff reported improvement of his hand and arm symptoms after surgery, and his treatment providers reported no restriction in either upper extremity after surgery. (*Id.*). Plaintiff also reported good relief of his shoulder pain after an injection. (*Id.*). An MRI from September 14, 2017, showed no rotator cuff tear, but some AC arthropathy and arthritic changes of the humeral head with labral degeneration or tear. (*Id.*). Dr. Bylak recommend surgery, but Plaintiff deferred. (*Id.*).

The record shows that Plaintiff engaged in activities of daily living that were inconsistent with his allegations of disability; he benefitted from treatment; he was not always compliant with his CPAP and pain medications; and, he deferred recommended surgery for his shoulder. When an ALJ discredits a claimant's credibility and gives good reason for doing so, the Eighth Circuit has held that it will defer to the ALJ's judgment. *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007); *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). The undersigned finds no error by the ALJ in discounting Plaintiff's subjective complaints.

### B.    RFC Determination

Plaintiff next argues the ALJ erred in his RFC determination as it did not include limitations that were well supported by the record, including longstanding problems with numbness, tingling, and weakness in his hands due to carpal tunnel and cubital tunnel issues and neuropathy in his upper extremities. (ECF No. 16, p. 13). Plaintiff also argues his back and shoulder impairments would prevent him from performing the exertional requirements of light work. (*Id.*, p. 14). Plaintiff further objects to the treatment of the medical source statement provided by treating physician, Dr. Wilson. (*Id.*, pp. 15-17).

A disability claimant has the burden of establishing his or her RFC. *Vossen*, 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination

concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Plaintiff had a history of carpal tunnel release prior to the relevant time period. (ECF No. 13, p. 452, 615). In February 2017, Plaintiff had normal range of motion and an unremarkable neurological exam, but positive Tinel and Phalen signs bilaterally. (*Id.*, p. 300). Dr. Wilson did not recommend any treatment beyond wearing night splints. (*Id.*, p. 346). In May, Plaintiff began to complain of joint pain and loss of grip in his hands. (*Id.*, p. 305). Dr. Wilson added glucosamine and naproxen to his treatment plan and recommended a nerve conduction study. (*Id.*, pp. 302, 304, 342). The nerve conduction study revealed bilateral upper extremity sensory neuropathy, left median motor neuropathy, and left ulnar sensorimotor mononeuropathy at the elbow. (*Id.*, pp. 341-42). In October 2017, Dr. Kelly recommended bilateral cubital and carpal tunnel release, starting with the left side as it was more severe. (*Id.*, p. 615). Dr. Kelly noted that Plaintiff would only be able to use one arm for four weeks post-surgery, and that he could not guarantee complete success as this was a repeat surgery. (*Id.*). Plaintiff had the left cubital and carpal tunnel release in November 2017 and reported at a follow-up visit that his left arm felt good and the pain and numbness were gone. (*Id.*, p. 619). Dr. Kelly released Plaintiff from all restrictions of the left hand. (*Id.*). Plaintiff underwent the same surgery on his right arm in December 2017, with additional synovectomy and fasciotomy of the right wrist and distal forearm. (*Id.*, p. 620-23). At a follow-up visit in January 2018, Plaintiff reported much better sensation in his first three fingers and improving intermittent numbness in the other two. (*Id.*, p. 624). Dr. Kelly advised Plaintiff that his hand would continue to improve over time, and opined he had restrictions on the right hand. (*Id.*). In March 2018 Plaintiff reported he still had intermittent numbness and tingling in his hands, and Dr. Knubley advised Plaintiff it was still relatively early and it may take longer to

14

see recovery, but that he may not see full recovery. (*Id.*, p. 626). Dr. Knubley's exam showed mildly reduced sensation to pinprick, and a grossly normal motor exam with normal reflexes. (*Id.*, p. 628). The record does not show any further complaints of carpal tunnel or cubital tunnel syndrome during the remainder of the relevant period. (*Id.*, pp. 60-63, 632-35, 731, 747-48, 767-68). The ALJ considered Plaintiff's history and treatment for carpal and cubital tunnel syndrome and appropriately restricted him to light work. (*Id.*, pp. 18-20).

Plaintiff's medical record also shows a history of treatment for left shoulder issues beginning in 2017. (*Id.*, p. 305). Dr. Wilson noted pain with abduction and external rotation of the left shoulder, and he recommended shoulder exercises and referred Plaintiff to Dr. Bylak. (*Id.*, pp. 304-307). X-rays of Plaintiff's shoulder showed degenerative arthrosis of the acromioclavicular joint, and Dr. Bylak gave Plaintiff a shot and provided him with a home exercise program. (*Id.*, p. 321, 460). An MRI showed some acromioclavicular arthropathy and arthritic change of the humeral head with labral degeneration or tear, and Dr. Bylak recommended surgery. Plaintiff deferred. (*Id.*, p. 595-96). In May 2018, Plaintiff again deferred surgery and reported good relief of his symptoms after the previous injections in his shoulder. (*Id.*, p. 629). Dr. Bylak planned to see Plaintiff on an as needed basis, or about every three months for more shoulder injections. (*Id.*). There is no evidence that Plaintiff went to follow-up appointments for more shoulder injections, and his next complaints of shoulder pain were to Dr. Wilson on January 9, 2019. (*Id.*, p. 42). The ALJ considered Plaintiff's left shoulder impairment and properly restricted him to only occasional overhead reaching with the left upper extremity. (*Id.*, pp. 18-21).

The ALJ considered Plaintiff's back impairment, beginning with his complaints of back pain to Dr. Wilson in February 2016. (*Id.*, p. 18). The ALJ considered the July 2016 MRI of Plaintiff's lumbar spine which showed degenerative changes at all levels and a mild broad-based

disc bulge at L4-L5 combining with degenerative facet change to cause spinal and mild bilateral foraminal stenosis. (*Id.*, pp. 19, 320). X-rays from June 2016 showed a slight progression of disc disease when compared to an April 2014 imaging study, and Plaintiff was given back exercises by Dr. Wilson. (*Id.*). The ALJ also considered Plaintiff's treatment history with Dr. Goodman for back pain, as well as Dr. Goodman's opinion that Plaintiff did not require a surgical consultation *or activity restrictions*, but conservative treatment with lumbar epidural steroid injections. (*Id.*, p. 19, 322-26). By limiting Plaintiff to light work with only occasional stooping and crouching, the ALJ adequately accounted for Plaintiff's back impairment. (*Id.* pp. 18-21).

The ALJ also expressly considered Plaintiff's actual activities, both from his statements and as reported to his treating providers. In April 2016, Plaintiff saw Dr. Wilson for new muscle spasms and cramping in his extremities. He reported that he recently moved and was hanging blinds, and that he had recently fallen while getting out of his boat. (*Id.*, pp. 20, 296). Plaintiff reported in March 2017 that he felt great after having his stent placed, and he was able to go back to finishing a house he and his wife were building. (*Id.*, pp. 20, 343). Plaintiff also reported he took care of his father by caring for his pets, helping him with laundry and mowing, and driving him to the doctor. (*Id.*, p. 249).

Plaintiff argues the ALJ erred by giving more weight to the opinions of state agency medical consultants rather than the opinion of his treating physician, Dr. Wilson, who restricted him to less than sedentary work. (ECF No. 16, pp. 15-17). The ALJ found the objective medical and other evidence in the record unsupportive of the extreme limitations opined by Dr. Wilson, and he thus found Dr. Wilson's opinion unpersuasive. (ECF No. 13, p. 21). Notably, Dr. Wilson provided his medical source statement in August 2017, while Plaintiff's carpal and cubital tunnel release surgeries were done in November and December 2017. (*Id.*, pp. 617, 620, 622-23). It was

not error for the ALJ to rely upon the opinions of the state agency medical consultants over the opinion of Dr. Wilson.

An ALJ may decide within a "zone of choice," and reversal is unwarranted simply because some evidence might support a different conclusion. *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). Here, the ALJ's RFC determination falls within the zone of choice and is substantially supported by the medical and other evidence of record.

### C.    Step Four Findings

Plaintiff finally argues the ALJ did not follow the appropriate legal standards when determining that he could return to his past relevant work, as his analysis was based upon an erroneous RFC finding. (ECF No. 16, p, 19).

At step four, the ALJ determines "whether a claimant's impairments keep [him] from doing past relevant work." *Wagner v. Astrue,* 499 F.3d 842, 853 (8th Cir. 2007) (quoting *Jones v. Chater,* 86 F.3d 823, 826 (8th Cir. 1996)). If "the claimant has the [RFC] to do either the specific work previously done or the same type of work as it is generally performed in the national economy, the claimant is found not to be disabled." *Lowe v. Apfel,* 226 F.3d 969, 973 (8th Cir. 2000). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. *Moore v. Astrue,* 572 F.3d 520, 523 (8th Cir. 2009); *Dukes v. Barnhart,* 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005).

In determining whether Plaintiff could return to his past relevant work, the ALJ considered both what Plaintiff actually performed and the testimony of a VE, consistent with the *Dictionary of Occupational Titles* ("DOT"), as to what was generally performed in the national economy. (ECF No. 13, pp. 22, 94-95). The VE testified that the DOT classified Plaintiff's past relevant work as a distribution warehouse manager. (*Id*.). The VE specifically testified that a hypothetical

person with Plaintiff's specific RFC, or even a sedentary RFC with the same additional restrictions, could perform this job. (*Id.*). The VE testified that her testimony regarding an individual with manipulative and/or reaching limitations was based on how the job was performed and on her own experience. (*Id.*).

With the aid of the VE and Plaintiff's testimony, the ALJ determined Plaintiff could perform his past relevant work as a distribution warehouse manager. (*Id.*). *See Wright v. Astrue*, 489 F. App'x 147, 149 (8th Cir. 2012) (citing 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)); *Wagner*, 499 F.3d at 853-54 (an ALJ can "consider the demands of the claimant's past relevant work either as the claimant actually performed it or, as here, as performed in the national economy."). The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff could perform his past relevant work.

## V.    Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed and that Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the District Court.**

DATED this 28th day of April 2020.

/s/ Mark E. Ford
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE